# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-1971V
Filed: January 17, 2025

|  |  |
|---|---|
| JANE BAKER,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Special Master Horner |

*David John Carney*, Green & Schafle, LLC, Philadelphia, PA, for petitioner.
*Madelyn Weeks*, U.S. Department of Justice, Washington, DC, for respondent.

## RULING ON ENTITLEMENT[1]

On October 6, 2021, petitioner, Jane Baker, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012), alleging that she suffered a Table Injury of a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccination she received on October 6, 2020. (ECF No. 1.) For the reasons set forth below, I conclude that petitioner is entitled to compensation.

### I. Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious, long-standing injury; and has

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

1

received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury.  In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1)(A)-(B); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within ≤48 hours of administration of a flu vaccine.  § 300aa-14(a) as amended by 42 CFR § 100.3.  Table Injury cases are guided by a statutory "Qualifications and aids in interpretation" ("QAI"), which provides more detailed explanation of what should be considered when determining whether a petitioner has actually suffered an injury listed on the Vaccine Injury Table.  *Id.*  To be considered a Table SIRVA petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).  SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i)   No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii)  Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv)  No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of

>radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy).

42 CFR § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner could still demonstrate entitlement to an award by instead showing that the vaccine recipient's injury or death was caused-in-fact by the vaccination in question. § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii).  The petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 321 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006).  Thus, to successfully demonstrate causation-in-fact, petitioner bears a burden to show: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury.  *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non–Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof.  § 300aa-13(1)(a).  That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly,* 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard).  Proof of medical certainty is not required.  *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991).  However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician.  § 300aa-13(a)(1).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1).  Special masters must ensure each party has had a "full and fair opportunity" to develop the record.  Vaccine Rule 3(b)(2).  However, special masters are empowered to determine the format for taking evidence based on the circumstances of each case.  Vaccine Rule 8(a); Vaccine Rule 8(d).  Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties.  Vaccine Rule 8(b)(1). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or

death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 300aa-13(b)(1).  The special master is required to consider all the relevant evidence of record, draw plausible inferences, and articulate a rational basis for the decision.  *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (quoting *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991)).

## II.     Procedural History

Petitioner initially filed medical records, an affidavit, and a statement of completion in October of 2021.  (ECF Nos. 6, 8; Exs. 1-7.)  She filed additional medical records and an amended statement of completion in July of 2022.  (ECF Nos. 15-16; Exs. 8-12.)  On September 23, 2022, respondent filed a status report identifying additional records that he identified as necessary to evaluate the case.  (ECF No. 17.)  Petitioner filed additional evidence in December of 2022, including photos of petitioner's vaccination site, work conference, etc.; emails regarding her injury; and affidavits from petitioner's niece, husband, coworkers, friend, and yoga instructor.  (ECF Nos. 20-21; Exs. 13-25.)  Petitioner filed a second amended statement of completion on January 5, 2023.  (ECF No. 22.)  The parties then engaged in settlement discussions between July and September of 2023 before reaching an impasse.  (ECF Nos. 26-29.)  Petitioner then filed additional medical records on October 14, 2023.  (ECF No. 30; Exs. 26-27.)

Petitioner filed a Motion for a Ruling on the Record and Brief in Support of Damages on October 14, 2023.  (ECF No. 31.)  Before respondent could file his response, petitioner filed a Motion to Supplement her Motion for a Ruling on the Record and Brief in Support of Damages, specifically to include damages for lost wages and out-of-pocket medical expenses.  (ECF No. 34.)  On February 9, 2024, respondent filed a response to both petitioner's Motion to Supplement and Motion for a Ruling on the Record and Brief in Support of Damages, arguing that petitioner had failed to satisfy the criteria for a SIRVA Table claim.  (ECF No. 35.)  Petitioner filed a reply on March 1, 2024.  (ECF No. 36.)

The case was reassigned to the undersigned on March 26, 2024.  (ECF No. 39.)  I subsequently issued a scheduling order indicating that, based on my review, the case appeared ripe only for resolution of entitlement.  (ECF No. 40.)  I instructed the parties to confirm that the case is ripe for resolution of entitlement based on the previously filed motion for a ruling on the record, which they did, but noted that I would not reach the question of damages absent additional briefing.  (ECF Nos. 40-41; NON-PDF Scheduling Order, filed April 25, 2024.)  Accordingly, I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve entitlement on the existing record.  *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *see also Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").  Accordingly, this matter is now ripe for resolution.

4

### III.     Factual History

    a.  As reflected in the medical records

Before receiving the vaccine at issue in this case, petitioner saw her physicians for regular preventative care appointments. (Ex. 3, pp. 68-81, 124-28, 152-69, 185-90, 284-93, 313-19, 513-18, 585-95, 735-40, 924-36, 985-95, 1027-44, 1110-24, 1050-56, 1225-29; Ex. 5, pp. 70-74, 83-84.) In 2014, petitioner began taking Fosamax and Vitamin D for low bone density. (Ex. 3, pp. 170-72.)

On October 15, 2014, petitioner received a flu vaccine, and, on November 20, 2014, she reported left arm muscle pain that began two days after her flu shot. (Ex. 3, pp. 191-192, 230.) Petitioner presented to her primary care physician, George Zotalis, M.D., on December 29, 2014, for worsening left arm pain. (*Id.* at 234.) Petitioner underwent an x-ray of her shoulder that showed a "nodular density in the left perihilar region." (*Id.* at 268.) Petitioner was diagnosed with frozen shoulder and was treated with a glenohumeral injection into the joint. (*Id.* at 251.) Petitioner continued to report pain and seek treatment throughout 2015. (*Id.* at 394-402, 418-26, 455-63, 473-83.) Petitioner's treatment included an additional shoulder injection, a Medrol pak, Voltaren gel, and a physical therapy referral. (*Id.* at 418-26, 449-53, 456.) Petitioner also underwent an ultrasound of the left shoulder that showed a "small articular sided Subscapularis tear, tendon bulk and contour preserved." (*Id.* at 521.) Petitioner was last treated for this injury on November 23, 2015. (*Id.* at 547, 585, 770, 1110.) She received compensation through this program for the injury as a "SIRVA." *Baker v. Sec'y of Health & Human Servs.*, No. 15-775V, 2015 WL 7428556 (Fed. Cl. Spec. Mstr. Oct. 30, 2015).

Petitioner received the vaccine at issue in this case on October 6, 2020. (Ex. 1, p. 1.) A week later, on October 13, 2020, petitioner reported to physician's assistant (PA) Jordan Bright with left shoulder pain lasting about a week. (Ex. 5, p. 8.) She reported that a burning pain began right after she received the flu vaccine and radiated from her deltoid to her collarbone. (*Id.*) Petitioner reported her history related to her shoulder and explained that she was taking ibuprofen which offered some relief. (*Id.*) The physical exam of her left shoulder revealed no trapezius trigger points in the deltoid, biceps tendon, or acromioclavicular joint. (*Id.* at 9.) Her range of motion with abduction was intact, however, her range of motion on flexion was limited to 100 degrees. (*Id.* at 9.) Petitioner was referred to physical therapy and prescribed naproxen for pain. (*Id.* at 9.)

Petitioner presented to physical therapy for an initial evaluation on October 14, 2020. (Ex. 4, pp. 9-11, 19-22.) She reported that she had inflammation and burning pain in her shoulder following her flu vaccine. (*Id.* at 9, 19.) Petitioner reported her history of a similar injury in 2014, explaining that she experienced pain and limited range of motion for a duration of 14 months. (*Id.* at 19.) She noted that her pain currently fluctuated between 3/10 and 7/10. (*Id.*) Petitioner's physical exam revealed reduced range of motion and strength. (*Id.* at 20.) Petitioner's physical therapist

5

explained that petitioner had "signs and symptoms of left shoulder adhesive capsulitis." (*Id.*)  During petitioner's next physical therapy session on October 16, 2020, petitioner reported that she was performing her at-home physical therapy program and noted slight improvement to her pain.  (*Id.* at 23.)   While her assessment showed some improvement with range of motion, the physical therapist reported that the petitioner still suffered from significant range of motion restrictions.  (*Id.*)  Petitioner attended physical therapy four more times in October of 2020.  (*Id.* at 26-37.)  She reported marginal increases in her range of motion.  (*Id.*)

On October 28, 2020, petitioner had an appointment at Geisinger Sports Medicine with Matthew McElroy, D.O.  (Ex. 3, p. 1165.)  Petitioner reported continued pain and her physical exam revealed limited range of motion, tenderness in her left biceps tendon on palpation, limited supraspinatus strength of the left shoulder, and left shoulder impingement with positive Neer and Hawkins tests.  (*Id.* at 1165, 1167.)  Petitioner received a subacromial bursa injection.  (*Id.* at 1169.)  On the same day, petitioner underwent an x-ray that showed "[m]ild osteoarthritis of the acromioclavicular joint." (*Id.* at 1190.)  Two days later, on October 30, 2020, petitioner had a physical therapy appointment and reported that the injection provided no relief.  (Ex. 4, p. 35.)

Petitioner continued physical therapy throughout November of 2020, attending seven appointments.  (Ex. 4, pp. 38-59.)  During this time, petitioner reported increased, intense pain.  (*Id.*)  On November 13, 2020, petitioner saw PA Bright for left arm bursitis.  (Ex. 5, p. 35.)  Petitioner reported about 70% improvement with physical therapy, however, petitioner noted continued pain, and requested to be placed on Naproxen.  (*Id.* at 35, 65.)  Petitioner's physical exam continued to reveal limited range of motion.  (*Id.* at 36.)

Petitioner did not attend another physical therapy appointment until March 5, 2021 with Adam Wolfe, PT.  (Ex. 6, p. 56-58.)  During her appointment, petitioner reported a history of left frozen shoulder following flu vaccination.  (*Id.* at 56.)  Petitioner reported that she tried physical therapy, however, the pain in her left shoulder persisted.  (*Id.*)  She described her current pain level as mild but noted that her mobility also remained limited.  (*Id.*)  She explained she was returning to physical therapy to attempt to regain full mobility.  (*Id.*)  She reported that her pain fluctuated between a 6/10 and a 2/10. (*Id.*)  Petitioner's strength in her shoulder abduction, shoulder external rotation, shoulder scaption, and shoulder external rotation at 90 degrees were all decreased in her left shoulder.  (*Id.* at 57.)  Additionally, petitioner's examination revealed positive Hawkins/Kennedy and Neers tests in her left shoulder.  (*Id.*)  PT Wolfe noted that petitioner "has signs and symptoms of left shoulder impingement following left shoulder adhesive capsulitis." (*Id.* at 58.)

Petitioner attended nine physical therapy appointments throughout the rest of March 2021, during which petitioner gradually improved.  (Ex. 6, pp. 31-50, 53-54.)  During her physical therapy session on March 29, 2021, petitioner reported that her shoulder was "feeling a lot better, but continu[ed] to be missing the 'last 10% of motion.'" (*Id.* at 31.)  Petitioner's physical assessment showed that her active and passive range

of motion along with her shoulder strength remained limited.  (*Id.* at 32.)  Her Hawkins/Kennedy and Neer tests remained positive.  (*Id.* at 33.)  On that same day, petitioner underwent an MRI of her left shoulder that was unremarkable and revealed "[n]o rotator cuff tear or MR findings of adhesive capsulitis."  (Ex. 12, p. 9.)

On April 7, 2021, petitioner had a follow up appointment with D.O. McElroy.  (Ex. 8, p. 6.)  Petitioner reported that her shoulder was feeling much better, and her range of motion was nearly normal.  (*Id.*)  She credited physical therapy as significantly helping her condition.  (*Id.*)  Upon physical exam, petitioner's range of motion was bilateral and equal, however, her left biceps tendon was "tender with palpation," she had weakness in her supraspinatus muscle, and her biceps and labral tests were positive on the left.  (*Id.* at 6-7.)  She was assessed with adhesive capsulitis of the left shoulder and biceps tendinitis.  (*Id.* at 7.)

Petitioner continued physical therapy, attending nine sessions throughout April 2021, and continued to refill her Naproxen prescription.  (Ex. 6, pp. 9-30; Ex. 8, p. 24.)  Throughout these sessions, petitioner continued to report significant improvement.  (Ex. 6, pp. 9-30.)  On April 30, 2021, petitioner was reevaluated by her physical therapist and reported 95% improvement.  (*Id.* at 9.)  Her physical exam still revealed some active and passive decreased range of motion and decreased strength; however, all her impingement and rotator cuff tests were negative.  (*Id.* at 9-11.)  Petitioner attended physical therapy one more time on May 3, 2021, before being discharged on May 6, 2021.  (*Id.* at 5-8; Ex. 5, pp. 114-16.)  Petitioner reported significant improvement, however, her symptoms did persist at her discharge.  (Ex. 5, pp. 114-16.)

On August 5, 2021, petitioner saw PA Julie Farrow, for right hand pain, numbness, tingling, and mechanical symptoms.  (Ex. 12, p. 17.)  Petitioner reported locking of her right ring finger and thumb, and then tingling and numbness in her right index and long finger.  (*Id.*)  She was no longer able to passively extend her ring finger.  (*Id.* at 17.)  Petitioner was diagnosed with carpal tunnel syndrome in her right wrist and trigger finger in her right ring finger.  (*Id.* at 21.)  Petitioner opted to undergo surgery.  (*Id.*)  Petitioner underwent an endoscopic carpal tunnel release and a release of the right ring trigger finger and trigger thumb on August 16, 2021.  (Ex. 10, pp. 15-18.)  Petitioner attended occupational therapy after her surgery.  (Ex. 12, pp. 57-59.)

### b. As reflected in affidavits and other evidence

In addition to her medical records, petitioner has filed several other pieces of evidence, including affidavits, photographs, and e-mails.  (Exs. 13-25.)  I have reviewed this evidence.  However, in light of the particular issues raised by the parties and the analysis that follows, it is not necessary to address these pieces of evidence in detail.

## IV.  Party Contentions

In her motion, petitioner argues that the evidence of record preponderantly establishes that she received a flu vaccine in her left shoulder on October 6, 2020, that she suffered onset of left shoulder pain within 48 hours of vaccination, and that her injury meets all of the QAI requirements for a Table SIRVA.  (ECF No. 31, p. 1.)  Petitioner requests a ruling in her favor finding she has suffered a Table SIRVA.  (*Id.* at 2.)  Petitioner does not present any alternative argument based on causation-in-fact.

In his response, respondent raises two issues with respect to petitioner's alleged Table SIRVA.  First, respondent contends that petitioner experienced symptoms that were not limited to her affected shoulder.  Specifically, respondent cites petitioner's October 13, 2020 primary care encounter as noting intense burning radiating from her deltoid to her collar bone area.  (ECF No. 35, p. 14.)  Second, respondent stresses that this case represents an unusual circumstance, because this petitioner was previously compensated for a SIRVA in the same shoulder relative to a prior vaccination.  (*Id.*)  Because petitioner retained counsel within a month of the vaccination at issue in this case, respondent urges that the subjective complaints in petitioner's medical records should be treated as "made-for-litigation" statements, which, citing several cases, he argues have historically carried little weight.  (*Id.* at 14-15.)  Respondent argues that the outcome in this case should be based on objective evidence and stresses that petitioner's left shoulder MRI was unremarkable, with no findings to support the presence of either a SIRVA or intense shoulder pain.  (*Id.* at 15-16.)  Accordingly, respondent requests that this case be dismissed.  (*Id.* at 16.)

In reply, petitioner argues the cases that respondent cited with respect to "made-for-litigation" statements are not on point, because petitioner's case does not rest on subjective statements made solely for litigation.  (ECF No. 36, p. 3.)  Petitioner stresses that there is not a shred of evidence that petitioner's subjective complaints to her treating physicians were made for litigation.  (*Id.* at 3-4.)  Further, petitioner never attempted to hide the fact of her previously successful SIRVA claim.  (*Id.* at 4.)  Petitioner observes that respondent's argument amounts to mere insinuation, especially given that respondent has not taken any steps seeking to litigate the question.  (*Id.*)  In any event, petitioner's subjective reports to her treating physicians were also supported by physical exam findings.  (*Id.* at 5.)  In that regard, petitioner urges the court to take notice of the fact that petitioner's treating physicians consistently linked her shoulder injury to her flu vaccination.  (*Id.*)  Petitioner notes that treating physician opinions are generally considered "quite probative."  (*Id.* at 5-6 (quoting *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1375 (Fed. Cir. 2009)).)

With respect to whether petitioner's symptoms were confined to her shoulder, petitioner cites a number of prior decisions by special masters for the proposition that the SIRVA QAI are intended to rule out other sources of injury and that stray references to pain beyond the shoulder are not necessarily dispositive of whether a SIRVA is present. (ECF No. 36, pp. 8-13.)  Petitioner stresses that the notation cited by respondent is the only reference to radiating symptoms within petitioner's medical

8

records and that her medical records substantiate that her symptoms relate to a musculoskeletal injury to the shoulder. (*Id.* at 13-14.) Petitioner contends that respondent's response has otherwise failed to raise any issue with the QAI criteria for a Table SIRVA, thereby conceding the other criteria are met. (*Id.* at 14-16.) Petitioner stresses that an abnormal MRI is not a requirement under the table definition of SIRVA. (*Id.* at 16-17.)

## V. Analysis

### a. QAI Criterion (i) - No history of pain, inflammation or dysfunction of the affected shoulder

Respondent stresses in his motion response that petitioner had a prior history of a left shoulder SIRVA in 2014 for which she received compensation. (ECF No. 35, p. 14.) Petitioner likewise acknowledges this history. (ECF No. 36, p. 4.) Importantly, however, the first SIRVA criterion addresses prior shoulder dysfunction "that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection." 42 C.F.R. § 100.3(c)(10)(i). Petitioner argues in her motion that her prior 2014 SIRVA "was completely healed" and that she had no issues with her left shoulder at the time of her 2020 flu vaccination. (ECF No. 31, p. 12.) Respondent has not raised any argument to the contrary. Although respondent raises the fact of petitioner's prior SIRVA in his motion response, he does so to stress that "[a]s a previous recipient of compensation from the Vaccine Program, petitioner is not ignorant of the requirements for an award of compensation." (ECF No. 35, p. 14.) In his recitation of the facts, respondent acknowledges that, despite seeking care for other unrelated issues, petitioner did not report any left shoulder pain between November 23, 2015, and October 13, 2020. (*Id.* at 3-4.) Accordingly, there is preponderant evidence that petitioner was free of any history of pain, inflammation or dysfunction of her left shoulder *that would explain* her alleged condition, as required by the first SIRVA criterion.

### b. QAI Criterion (ii) - Pain occurs within the specified time-frame (48 hours)

Petitioner was vaccinated on October 6, 2020, and first presented for care a week later on October 13, 2020. (Ex. P1, p. 1; Ex. P5, p. 8.) At that time, she reported that she had been experiencing shoulder pain for a week and explained that it started "right after" the flu vaccination. (Ex. P5, p. 8.) Although respondent argues that petitioner's statements to her physicians should not carry significant weight, he does not raise any specific argument that petitioner's shoulder pain arose at any time outside of the appropriate 48-hour post-vaccination time-frame. (ECF No. 35, pp. 14-16.) To the extent respondent implies based on petitioner's MRI that she may not have experienced shoulder pain *at all*, this is not persuasive in light of petitioner's overall course of treatment. Petitioner's initial physical therapy evaluation included objective findings of reduced strength and reduced range of motion sufficient to corroborate her subjective complaints of a bothersome shoulder injury. (Ex. 4, p. 20.) Her later orthopedic

evaluation included a physical exam that found slightly limited abduction and external rotation along with positive Hawkins and Neer tests. (*Id.* at 14.) Petitioner was assessed by her orthopedist as having impingement syndrome and administered treatment in the form of a therapeutic injection. (*Id.* at 15.) Accordingly, there is preponderant evidence that petitioner experienced onset of left shoulder pain within 48 hours of her October 6, 2020 flu vaccination, as required by the second SIRVA criterion.

### c. QAI Criterion (iii) - Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered

Respondent stresses that when petitioner first presented for care of her alleged SIRVA, she reported that she "[f]elt intense burning which she never had before. Is radiating from deltoid into collar bone area." (ECF No. 35, p. 14; Ex. 5, p. 8.) Accordingly, respondent argues that petitioner's pain was not limited to her left shoulder as required by the third SIRVA criterion. (ECF No. 35, p. 14.) As petitioner notes, however, I have previously explained at greater length in a prior decision that "the gravamen of this requirement is to guard against compensating claims involving patterns of pain or reduced range of motion indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder." *Grossmann v. Sec'y of Health & Human Servs.*, No. 18-13V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022) (citing *Werning v. Sec'y of Health & Human Servs.*, No. 18-267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020).) Although petitioner characterized her pain this way in her initial encounter with her primary care provider, the provider's record does not indicate that he placed any significance on that report. (Ex. 5, pp. 9-10.) Respondent does not cite any instance where this report was repeated or ever analyzed as diagnostically relevant by any treating physician. Respondent's recitation of the facts otherwise reflects a course of treatment for a musculoskeletal injury to the left shoulder and respondent does not suggest that the treating physicians ever suspected any etiology beyond the confines of the shoulder. (ECF No. 35, pp. 4-8.) Accordingly, there is preponderant evidence that petitioner's pain and reduced range of motion were limited to her affected shoulder within the meaning of the third SIRVA criterion. *Accord Grossmann*, 2022 WL 779666, at *15.

### d. QAI Criterion (iv) - No other condition or abnormality is present that would explain the patient's symptoms – and factor(s) unrelated to vaccination

The fourth SIRVA criterion requires that there be no other condition or abnormality present that would otherwise explain the petitioner's symptoms. Moreover, once a petitioner has met her initial burden of proof in demonstrating the presence of a Table injury, respondent may still demonstrate that the injury was nonetheless caused by a factor unrelated to vaccination. § 300aa-13(a)(1)(B); *Deribeaux v. Sec'y of Health & Human Servs.*, 717 F.3d 1363, 1367 (Fed. Cir. 2013). Respondent has not raised any argument suggesting that petitioner's alleged SIRVA may be explained by any other condition or abnormality. (ECF No. 35, pp. 14-16.) My own review of the medical history has not otherwise found any condition or abnormality concerning as a potential

cause of petitioner's condition. Accordingly, there is preponderant evidence that petitioner's clinical presentation is free of any other condition or abnormality that would explain her alleged SIRVA, as required by the fourth SIRVA criterion. Moreover, petitioner having *prima facie* demonstrated the presence of a Table SIRVA, respondent has not otherwise demonstrated that petitioner's injury is due to factors unrelated to vaccination.

### e. Respondent's additional argument

Notwithstanding the above, respondent raises two additional arguments that he suggests as overriding considerations that should cast doubt on the idea that any injury was present at all. As explained above, he contends that (1) petitioner's subjective complaints in her medical records should be dismissed merely as statements made for litigation and (2) petitioner's MRI, which was unremarkable, constitutes objective evidence casting doubt on the presence of any shoulder injury. (ECF No. 35, pp. 14-16.) I have considered these arguments but find them unpersuasive.

Although respondent is correct that there are circumstances in which statements can be made for litigation purposes even when directed to a physician, respondent casts his suspicion too widely in applying that concern to this case. Respondent cites four prior decisions, all of which are distinguishable. (ECF No. 35, pp. 14-15.) Three of the four cases cited by respondent involved situations where later, conflicting reports to medical providers were discounted relative to more contemporaneous records, in part, because the petitioner had developed a motivation relative to litigation. *Duda v. Sec'y of Health & Human Servs.*, No. 19-31V, 2021 WL 4735857, at * 8 (Fed. Cl. Spec. Mstr. Aug. 10, 2021); *Vashro v. Sec'y of Health & Human Servs.*, No. 20-1849V, 2023 WL 6643108, at *3 (Fed. Cl. Spec. Mstr. Sept. 5, 2023); *Goodgame v. Sec'y of Health & Human Servs.*, 157 Fed. Cl. 62, 71 (2021). In all of these cases, the petitioner's motivation was just one factor in an overall weighing of evidence that simply favored more contemporaneous records as more likely to be accurate, which is not a remarkable proposition in this program. In this case, however, petitioner's most contemporaneous records support her allegation.

In the fourth case cited by respondent, *Rastetter v. Secretary of Health & Human Services.*, the petitioner had previously stopped seeking treatment, the medical record at issue explicitly indicated that the evaluation had been sought for litigation only, and the petitioner refused any follow-up treatment for that very reason. No. 19-1840V, 2023 WL 5552317, at *10 (Fed. Cl. Spec. Mstr. Aug. 3, 2023). Thus, it was observed that "[w]ithout a bona fide ongoing treatment relationship, the credibility and reliability of the history provided by petitioner and his mother is not enhanced merely because it was recorded by a medical provider." *Id.* Again, however, that is not the situation in this case. Petitioner's medical records reflect ongoing care and treatment with supportive physical examination and medical evaluation. Only respondent's own imputation suggests the lack of a bona fide treatment relationship. Respondent effectively seeks to penalize petitioner merely for being aware of this program.

      Seeking to buttress his skepticism of petitioner's subjective complaints of pain, respondent further argues that, because petitioner's MRI was unremarkable, there is a lack of objective evidence of any actual shoulder injury. This is unpersuasive for several reasons. First, petitioner's MRI is not the only objective evidence of record. As explained above, petitioner had physical exam findings that objectively confirmed she suffered reduced strength, reduced range of motion, and was positive for signs of impingement based on special testing. Second, petitioner's orthopedist did not treat the MRI as dispositive. After reviewing the MRI results, he diagnosed petitioner with ongoing biceps tendinitis for which continued physical therapy was recommended. (Ex. 7, pp. 1-2.) And third, the QAI requirements for a Table SIRVA place no specific burden on petitioner to demonstrate abnormal findings on MRI or to even substantiate any particular diagnosis relative to the complained of shoulder symptoms.

## VI.    Conclusion

      After weighing the evidence of record within the context of this program, I find by preponderant evidence that petitioner suffered a Table Injury of SIRVA resulting from the flu vaccination she received on October 6, 2020. Accordingly, petitioner is entitled to compensation for her SIRVA. A separate damages order will be issued.

**IT IS SO ORDERED.**

                                                                      <u>**s/Daniel T. Horner**</u>
                                                                      Daniel T. Horner
                                                                      Special Master