# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 21-1971V
Filed: May 23, 2025

| | |
|---|---|
| JANE BAKER,<br><br>    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>    Respondent. | Special Master Horner |

*David John Carney*, Green & Schafle, LLC, Philadelphia, PA, for petitioner.
*Madelyn Weeks*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION AWARDING DAMAGES[1]

On October 6, 2021, petitioner, Jane Baker, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012), alleging that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccination she received on October 6, 2020. (ECF No. 1.) On January 17, 2025, petitioner was found entitled to compensation for her SIRVA. (ECF No. 42.) For the reasons set forth below, I now conclude that petitioner is entitled to compensation for her damages in the amount of $77,472.07.

### I. Procedural History

This case was initially assigned to the Special Processing Unit ("SPU"). (ECF No. 10.) Petitioner filed medical records, an affidavit, and a statement of completion in October of 2021. (ECF Nos. 6, 8; Exs. 1-7.) She filed additional medical records and an amended statement of completion in July of 2022. (ECF Nos. 15-16; Exs. 8-12.) On

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the document will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

1

September 23, 2022, respondent filed a status report providing an informal assessment of the claim and identifying potential issues, including petitioner's history of a left shoulder injury for which she previously received compensation. (ECF No. 17.) Petitioner filed additional evidence in December of 2022, including photos of petitioner's vaccination site, work conference, etc.; emails regarding her injury; and affidavits from petitioner's niece, husband, coworkers, friend, and yoga instructor. (ECF Nos. 20-21; Exs. 13-25.) Petitioner filed a second amended statement of completion on January 5, 2023. (ECF No. 22.) The parties then engaged in settlement discussions between July and September of 2023 before reaching an impasse. (ECF Nos. 26-29.) Petitioner then filed additional medical records on October 14, 2023. (ECF No. 30; Exs. 26-27.)

Petitioner filed a Motion for a Ruling on the Record and Brief in Support of Damages on October 14, 2023. (ECF No. 31.) Before respondent could file his response, petitioner filed a Motion to Supplement her Motion for a Ruling on the Record and Brief in Support of Damages, specifically to include damages for lost wages and out-of-pocket medical expenses. (ECF No. 34.) On February 9, 2024, respondent filed a response to both petitioner's Motion to Supplement and Motion for a Ruling on the Record and Brief in Support of Damages, arguing that petitioner had failed to satisfy the criteria for a SIRVA Table claim. (ECF No. 35.) Petitioner filed a reply on March 1, 2024. (ECF No. 36.)

The case was reassigned to the undersigned on March 26, 2024. (ECF Nos. 38-39.) I subsequently issued a scheduling order indicating that, based on my review, the case appeared ripe only for resolution of entitlement. (ECF No. 40.) I instructed the parties to confirm that the case is ripe for resolution of entitlement based on the previously filed motion for a ruling on the record, which they did, but noted that I would not reach the question of damages absent additional briefing. (ECF Nos. 40-41; Non-PDF Scheduling Order, filed Apr. 25, 2024.)

On January 17, 2024, I issued a Ruling on Entitlement, finding petitioner entitled to compensation for her SIRVA. (ECF No. 42.) Thereafter, I gave the parties a brief opportunity to attempt an informal resolution of damages; however, they were unable to do so. (ECF No. 45.) I directed respondent to file a brief regarding the appropriate amount of damages and permitted petitioner a reply. (ECF Nos. 46-47.)

Accordingly, I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve damages on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *see also Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").

## II.  Factual History

### a. As reflected in the medical records

Petitioner received the vaccine at issue in this case on October 6, 2020.[2]  (Ex. 1, p. 1.)  A week later, on October 13, 2020, petitioner reported to physician assistant ("PA") Jordan Bright with left shoulder pain lasting about a week.  (Ex. 5, p. 8.)  She reported that a burning pain began right after she received the flu vaccine and radiated from her deltoid to her collarbone.  (*Id.*)  Petitioner reported her history related to her shoulder and explained that she was taking ibuprofen which offered some relief.  (*Id.*)  The physical exam of her left shoulder revealed no trapezius trigger points in the deltoid, biceps tendon, or acromioclavicular joint.  (*Id.* at 9.)  Her range of motion with abduction was intact; however, her range of motion on flexion was limited to 100 degrees.  (*Id.*)  Petitioner was referred to physical therapy and prescribed naproxen for pain.  (*Id.*)

Petitioner presented to physical therapy for an initial evaluation on October 14, 2020.  (Ex. 4, pp. 9-11, 19-22.)  She reported that she had inflammation and burning pain in her shoulder following her flu vaccine.  (*Id.* at 9, 19.)  She noted that her pain currently fluctuated between 3/10 and 7/10.  (*Id.* at 19.)  Petitioner's physical exam revealed reduced range of motion and strength.  (*Id.* at 20.)  Petitioner's physical therapist explained that petitioner had "signs and symptoms of left shoulder adhesive capsulitis."  (*Id.*)  During petitioner's next physical therapy session on October 16, 2020, petitioner reported that she was performing her at-home physical therapy program and noted slight improvement to her pain.  (*Id.* at 23.)   While her assessment showed some improvement with range of motion, the physical therapist reported that the petitioner still suffered from significant range of motion restrictions.  (*Id.*)  Petitioner attended physical therapy four more times in October of 2020.  (*Id.* at 26-37.)  She reported marginal increases in her range of motion.  (*Id.*)

On October 28, 2020, petitioner had an appointment at Geisinger Sports Medicine with Matthew McElroy, D.O.  (Ex. 3, p. 1165.)  Petitioner reported continued pain, and her physical exam revealed limited range of motion, tenderness in her left biceps tendon on palpation, limited supraspinatus strength of the left shoulder, and left shoulder impingement with positive Neer and Hawkins tests.  (*Id.* at 1165, 1167.)  Petitioner received a subacromial bursa injection.  (*Id.* at 1169.)  On the same day, petitioner underwent an x-ray that showed "[m]ild osteoarthritis of the acromioclavicular joint."  (*Id.* at 1190.)  Two days later, on October 30, 2020, petitioner had a physical therapy appointment and reported that the injection provided no relief.  (Ex. 4, p. 35.)

Petitioner continued physical therapy throughout November of 2020, attending seven appointments.  (Ex. 4, pp. 38-59.)  During this time, petitioner reported an

---

[2] She had a prior SIRVA in the same arm, for which she was previously found entitled to compensation.  *Baker v. Sec'y of Health & Human Servs.*, No. 15-775V, 2015 WL 7428556 (Fed. Cl. Spec. Mstr. Oct. 30, 2015).

3

increase in the intensity of her pain.  (*Id.*)  On November 13, 2020, petitioner saw PA Bright for left arm bursitis.  (Ex. 5, p. 35.)  Petitioner reported about 70% improvement with physical therapy, however, petitioner noted continued pain and requested to be placed on naproxen.  (*Id.*)  Petitioner's physical exam continued to reveal limited range of motion.  (*Id.* at 36.)

Petitioner did not attend another physical therapy appointment until her March 5, 2021 session with Adam Wolfe, PT.  (Ex. 6, pp. 56-58.)  During her appointment, petitioner reported a history of left frozen shoulder following flu vaccination.  (*Id.* at 56.)  Petitioner reported that she tried physical therapy, however, the pain in her left shoulder persisted.  (*Id.*)  She described her current pain level as mild but noted that her mobility also remained limited.  (*Id.*)  She explained she was returning to physical therapy to attempt to regain full mobility.  (*Id.*)  She reported that her pain fluctuated between a 6/10 and a 2/10.  (*Id.*)  Petitioner's strength in her shoulder abduction, shoulder external rotation, shoulder scaption, and shoulder external rotation at 90 degrees were all decreased in her left shoulder.  (*Id.* at 57.)  Additionally, petitioner's examination revealed positive Hawkins/Kennedy and Neer tests in her left shoulder.  (*Id.*)  PT Wolfe noted that petitioner "has signs and symptoms of left shoulder impingement following left shoulder adhesive capsulitis."  (*Id.* at 58.)

Petitioner attended nine physical therapy appointments throughout the rest of March of 2021, during which petitioner gradually improved.  (Ex. 6, pp. 31-50, 53-54.)  During her physical therapy session on March 29, 2021, petitioner reported that her shoulder was "feeling much better, but continues to be missing the 'last 10% of motion.'"  (*Id.* at 31.)  Petitioner's physical assessment showed that her active and passive range of motion along with her shoulder strength remained limited.  (*Id.* at 32.)  Her Hawkins/Kennedy and Neer tests remained positive.  (*Id.* at 33.)  On that same day, petitioner underwent an MRI of her left shoulder that was unremarkable and revealed "[n]o rotator cuff tear or MR findings of adhesive capsulitis."  (Ex. 12, p. 9.)

On April 7, 2021, petitioner had a follow up appointment with Dr. McElroy.  (Ex. 8, p. 6.)  Petitioner reported that her shoulder was feeling much better, and her range of motion was nearly normal.  (*Id.*)  She credited physical therapy as significantly helping her condition.  (*Id.*)  Upon physical exam, petitioner's range of motion was bilateral and equal, however, her left biceps tendon was "tender to palpation," she had weakness in her left supraspinatus muscle, and her biceps and labral tests were positive on the left.  (*Id.* at 6-7.)  Dr. McElroy noted that petitioner's adhesive capsulitis of the left shoulder had resolved and assessed her with biceps tendinitis.  (*Id.* at 7.)

Petitioner continued physical therapy, attending nine sessions throughout April of 2021, and continued to refill her naproxen prescription.  (Ex. 6, pp. 9-30; Ex. 8, p. 24.)  Throughout these sessions, petitioner continued to report significant improvement.  (Ex. 6, pp. 9-30.)  On April 30, 2021, petitioner was reevaluated by her physical therapist and reported 95% improvement.  (*Id.* at 9.)  Her physical exam still revealed some active and passive decreased range of motion and decreased strength; however, all her impingement and rotator cuff tests were negative.  (*Id.* at 9-11.)  Petitioner attended two

physical therapy sessions in May of 2021, before being discharged on May 6, 2021. (*Id.* at 5-8; Ex. 5, pp. 114-16.) Petitioner reported significant improvement, however, her symptoms did persist at her discharge. (Ex. 5, p. 114: Ex. 6, p. 5.)

Petitioner returned to Dr. McElroy on August 4, 2021. (Ex. 26, pp. 20-22.) She had "fairly good range of motion" as well as normal strength but did have some pain with extreme ranges of motion, which was causing her to sleep differently. (*Id.* at 20.) She also reported experiencing some numbness in her right hand at night that she believed to be positional. (*Id.*) Dr. McElroy assessed petitioner with chronic impingement of the left shoulder and tendinopathy of the left biceps tendon. (*Id.* at 21.) She had an ultra-sound guided therapeutic (Ropivacaine) injection at this encounter. (*Id.* at 21-22.)

On August 5, 2021, petitioner saw PA Julie Farrow, for right hand pain, numbness, tingling, and mechanical symptoms. (Ex. 12, p. 17.) Petitioner reported locking of her right ring finger and thumb and tingling and numbness in her right index and long finger. (*Id.*) She was no longer able to passively extend her ring finger. (*Id.*) Petitioner was diagnosed with carpal tunnel syndrome in her right wrist and trigger finger in her right ring finger. (*Id.* at 21.) Petitioner opted to undergo surgery. (*Id.*) Petitioner underwent an endoscopic carpal tunnel release and a release of the right ring trigger finger and trigger thumb on August 16, 2021. (Ex. 10, pp. 15-18.) Petitioner attended occupational therapy after her surgery. (Ex. 12, pp. 57-59.)

Petitioner had another follow up with Dr. McElroy on August 24, 2022, at which time it was noted that she had responded "very well" to the prior therapeutic injection. (Ex. 26, p. 213.) At this encounter, she received another therapeutic (Lidocaine) injection. (*Id.* at 216.)

### b. As reflected in affidavits and other evidence

In addition to her medical records, petitioner has filed several witness statements. Candace Baker, petitioner's niece, recalled petitioner experiencing a new onset of worsening pain during the three months following her vaccination, such that it was painful "doing normal things like lifting objects or even walking my dog." (Ex. 20, ¶ 6.) Paul Baker, Jr., petitioner's husband, recalled that, although petitioner was initially able to continue yoga following her vaccination, she was experiencing debilitating pain during the 2020 holiday season and thereafter, noting as of October 2022 she was still unable to sleep on her left side. (Ex. 21, ¶¶ 8-9.) Denise Lewis, a coworker, primarily recalled that petitioner had been asymptomatic prior to vaccination. (Ex. 22, ¶¶ 4-5.) Jeffrey Turner, a coworker, recalled petitioner being in pain from the time of her vaccination throughout the remainder of the academic semester. (Ex. 23, ¶ 6.) Kara VanBuskirk, a coworker, likewise recalled that petitioner experienced a new onset of shoulder symptoms following her vaccination. (Ex. 24, ¶¶ 4-6.) Donelle Bryson, petitioner's cousin and yoga teacher, explained that, although petitioner continued to attend yoga classes after receiving her flu shot, she had difficulty with some poses and required modifications. (Ex. 25, ¶¶ 4, 6.)

As discussed further below, petitioner also filed several documents in support of her claims for loss of earnings and out-of-pocket expenses. Regarding her loss of earnings, she filed a letter by the chair of her department at Bucknell University, where petitioner works as an administrative assistant, explaining petitioner's hourly pay rate and her employer's policy regarding the payout of leave upon separation or retirement. (ECF No. 34, p. 8.) She also filed a document tiled "Absence Jane K Baker, Bucknell University," with columns documenting the date, type (sick, vacation, or "FMLA"), number of hours, and status (i.e., approved), of various leave requests between October of 2020 and August of 2022. (*Id.* at 9-12.) Finally, she filed several credit card statements and invoices regarding her claimed expenses. (*Id.* at 13-34.)

### III.   Analysis

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 300aa-15(a)(4). Additionally, a petitioner may recover for unreimbursable expenses and loss of earning capacity. § 300aa-15(a)(1)-(3). In this case, petitioner asserts she should recover all three categories of damages. (ECF Nos. 31, 34, 47.) Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

#### a. Pain and Suffering

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (reasoning that "[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) (concluding that "the assessment of pain and suffering is inherently a subjective evaluation"). In general, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Human Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior awards when determining what constitutes an appropriate award of damages. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"); *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (explaining that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual

6

claims). Importantly, however, while potentially persuasive, decisions regarding prior awards are not binding. *See Nance v. Sec'y of Health & Human* Servs., No. 06-0730V, 2010 WL 3291896, at *8 (Fed. Cl. Spec. Mstr. July 30, 2010); *Hanlon v. Sec'y of Health & Human Servs.,* 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand."), *aff'd*, 191 F.3d 1344 (Fed. Cir. 1999).

Based on prior experience within the SPU as of the beginning of 2025, the overall spectrum of proffered SIRVA awards extends from $5,000.00 to $1,845,047.00. *Timberlake v. Sec'y of Health & Human Servs.*, No. 20-1905V, 2025 WL 721730, at *3 (Fed. Cl. Spec. Mstr. Feb. 19, 2025). Eliminating outliers, the first and third quartiles span from $60,000.00 to $107,987.07. (*Id.*) The median is $80,000.00. (*Id.*) Damages awards based on decisions by special masters run slightly higher, with the first and third quartile range being from $67,305.16 to $125,000.00 and a median of $89,500.00. (*Id.*)

Petitioner initially argued that she should be awarded $75,000.00 for actual and projected pain and suffering (ECF No. 31, p. 35), but later revised her assessment upward, arguing in reply to respondent's argument that she should be awarded between $75,000.00 and $80,000.00. (ECF No. 36, p. 24.) She cited the following prior cases as comparable: *Belka v. Sec'y of Health & Human Servs.*, No. 20-0585V, 2022 WL 4717891 (Fed Cl. Spec. Mstr. Sept. 1, 2022) (awarding $68,000.00 for pain and suffering); *Alcantara v. Sec'y of Health & Human Servs.*, No. 20-0990V, 2022 WL 2800868 (Fed. Cl. Spec. Mstr. June 10, 2022) (awarding $70,000.00 for pain and suffering); *Hartman v. Sec'y of Health & Human Servs.*, No. 19-1106V, 2022 WL 444456 (Fed. Cl. Spec. Mstr. Jan. 14, 2022) (awarding $75,000.00 for pain and suffering); *Miller v. Sec'y of Health & Human Servs.*, No. 20-604V, 2022 WL 3641716 (Fed. Cl. Spec. Mstr. July 22, 2022) (awarding $75,000.00 for pain and suffering); *Moreland v. Sec'y of Health & Human Servs.*, No. 18-1319V, 2022 WL 10469047 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (awarding $75,000.00 for pain and suffering); *Mantagas v. Sec'y of Health & Human Servs.*, No. 20-1720V, 2023 WL 4573855 (Fed. Cl. Spec. Mstr. June 14, 2023) (awarding $75,000.00 for pain and suffering); *Smith v. Sec'y of Health & Human Servs.*, No. 21-409V, 2023 WL 9288086 (Fed. Cl. Spec. Mstr. Dec. 11, 2023) (awarding $77,000.00 for pain and suffering); *Starnes v. Sec'y of Health & Human Servs.*, No. 20-1514V, 2023 WL 8110730 (Fed. Cl. Spec. Mstr. Oct. 13, 2023) (awarding $78,000.00 for pain and suffering); *Eichorn v. Sec'y of Health & Human Servs.*, No. 20-154V, 2023 WL 8525127 (Fed. Cl. Spec. Mstr. Nov. 7, 2023) (awarding $78,000.00 for past pain and suffering as well as an award for future pain and suffering); *Bergstrom v. Sec'y of Health & Human Servs.*, No. 19-0784V, 2021 WL 5754968 (Fed. Cl. Spec. Mstr. Nov. 2, 2021) (awarding $80,000.00 for pain and suffering). (ECF No. 31, pp. 31-35; ECF No. 36, pp. 19-24; ECF No. 47, pp. 10-32.)

Before entitlement was resolved, respondent initially asserted (*arguendo*) that petitioner should be awarded only $46,000.00 for pain and suffering. (ECF No. 35, p. 16.) At that time, he cited the following cases as comparable: *Piccolotti v. Sec'y of Health & Human Servs.*, No. 20-0135V, 2023 WL 3165383 (Fed. Cl. Spec. Mstr. May 1, 2023) (awarding $45,000.00 for pain and suffering); *Merwitz v. Sec'y of Health &

7

*Human Servs.*, No. 20-1141V, 2022 WL 17820768 (Fed. Cl. Spec. Mstr. Nov. 14, 2022) (awarding $50,000.00 for pain and suffering). (*Id.* at 23-25.) After entitlement was granted, respondent revised his assessment to $60,000.00, though his analysis remained substantially the same. (ECF No. 46, p. 7.) Respondent then cited the following cases as comparable: *Allner v. Sec'y of Health & Human Servs.*, No. 19-1048V, 2022 WL 6962656 (Fed. Cl. Spec. Mstr. Sept. 9, 2022) (awarding $60,000.00 for pain and suffering); *Krebs v. Sec'y of Health & Human Servs.*, No. 21-484V, 2024 WL 4930680 (Fed. Cl. Spec. Mstr. Oct. 31, 2024) (awarding $60,000.00 for pain and suffering). (*Id.* at 7-9.)

I am mindful of prior decisions regarding damages for SIRVA, including those cited by the parties. However, I do not merely rely on any prior decision to determine the amount of petitioner's damages in this case. Instead, I have reviewed previous SIRVA awards, the arguments presented by the parties, and the totality of the evidentiary record. The primary considerations informing pain and suffering in SIRVA cases is the severity and duration of the shoulder pain. Numerous aspects of a petitioner's medical history potentially speak to these issues, including the total duration of the petitioner's pain, the total duration of petitioner's reduced range of motion, the length of time over which the petitioner actively treated the condition, the duration and outcome of physical therapy, the modalities of treatment (*e.g.*, steroid injections, surgeries, etc.), the severity of MRI or surgical findings, subjective reports of pain levels, and the ultimate prognosis.

In this case, petitioner explains that she "has treated her left shoulder injury for over twenty-two months, or nearly two years, with two cortisone injections, one of which was ultrasound-guided, a lidocaine injection, prescription medication, an MRI, and two rounds of physical therapy totaling thirty-four (34) sessions." (ECF No. 31, p. 35; ECF No. 36, p. 24.) Respondent agrees with petitioner's basic explanation of her treatment history – a 22-month course of treatment with prescription medication, three therapeutic injections, and thirty-four physical therapy sessions. (ECF No. 46, p. 7.) However, respondent contends that petitioner experienced only "low to moderate" levels of shoulder pain and only a slight limitation in her range of motion and stresses that there are gaps in treatment totaling 18 months. (*Id.* at 7-10; ECF No. 35, p. 18.) Petitioner contends that her gap in treatment is at least partly explained by the Covid-19 pandemic (ECF No. 47, p. 4); however, respondent also stressed that petitioner returned to her desired activities following her physical therapy discharge in May of 2021 and saw significant relief from her August 2021 steroid injection. (ECF No. 35, pp. 18-19.)

I am not persuaded that the cases cited by respondent are comparable to this case. The *Krebs* petitioner had an overall course of 18 months of SIRVA symptoms characterized as mild to moderate. 2024 WL 4930680, at *9. Like this petitioner, he had multiple therapeutic injections. *Id.* Unlike this petitioner, however, he had only two physical therapy appointments. *Id.* Although he had a home exercise plan, he was noncompliant. *Id.* Thus, the duration of the *Krebs* petitioner's injury was shorter, and he had less robust treatment. Although the *Allner* petitioner had a much longer overall course of injury, she sought conservative treatment only intermittently and had

significant gaps in treatment suggestive of only a mild injury. 2022 WL 6962656, at *6. The award in that case was further informed by a delay in initially seeking treatment and resort to only eight physical therapy sessions. *Id.* at *5-6. By contrast, two cases cited by petitioner are reasonably analogous to the instant case. The *Miller* petitioner had an initial delay in treatment suggestive of a mild to moderate injury, but ultimately had a 17-month long course of treatment, inclusive of twenty-one physical therapy encounters and three steroid and trigger point injections, but with a seven-month gap in treatment. 2022 WL 3641716, at *5-6, *5 nn.10-11. The *Moreland* petitioner underwent treatment for approximately 18 months, including forty-three physical therapy sessions and three steroid injections. 2022 WL 10469047, at *13, *13 nn.22, 24. I find the remainder of the cited cases less helpful. In particular, while the *Eichorn* petitioner similarly had thirty-nine sessions of physical therapy and two cortisone injections, she consistently treated her condition over the course of a year and ultimately had a 6% permanent disability that not only factored into past pain and suffering, but also supported an award for future pain and suffering. 2023 WL 8525127, at *5-7.

Considering the evidence of record and the arguments presented by the parties, and for the reasons stated above, I find that a reasonable award for petitioner's past pain and suffering is $75,000.00.

### b. Loss of Earnings

Under the Vaccine Act, compensation for actual and anticipated loss of earnings may be awarded "[i]n the case of any person who has sustained a vaccine-related injury after attaining the age of 18 and whose earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded." § 300aa-15(a)(3)(A). Petitioner argues that she should be awarded $10,500.54 for loss of earnings because she missed 414 hours of work between October 14, 2020, and August 24, 2022, as a direct result of her SIRVA.[3] (ECF No. 34, pp. 1-2.) Petitioner reasons that her time off, though paid time off, still had monetary value because her employer would have paid out accrued time upon her retirement. (*Id.*) Respondent raises three arguments in opposition. (ECF No. 35, pp. 25-27.) First, respondent appears to argue as a threshold matter that petitioner has not demonstrated an impairment in her earning capacity. (*Id.* at 25.) Second, respondent argues that it would be speculative to base a loss of earnings award on a future payout of accrued leave. (*Id.* at 26.) And, third, respondent argues that petitioner has overstated the leave that can be attributed to her SIRVA. (*Id.* at 26-27.) I am persuaded by respondent's objection to the scope of petitioner's loss of earnings claim, but not his objection to the availability of this type of award.

---

[3] In her motion, petitioner indicates that she is requesting compensation relative to 150 hours of missed work; however, a review of the hours she has included in her request confirms that her tally of the hours at issue is incorrect. (ECF No. 34, pp. 5-7.) Moreover, given her hourly pay rate (*id.* at 8), the requested amount of $10,500.54 is more consistent with a request based on 414 hours.

9

Petitioner, who is paid as an hourly employee, filed a print-out of a Table titled "Absence Jane K Baker, Bucknell University." (ECF No. 34, pp. 9-12.) The document contains various leave requests (sick, vacation, and FMLA) from October 14, 2020 through August 24, 2022, totaling 414 hours of leave. (*Id.*) However, petitioner's absence sheet does not indicate the reason for any of her leave requests. Although many of the leave requests do correlate to medical encounters for petitioner's SIRVA within her otherwise filed medical records, respondent stresses that many others do not. (ECF No. 35, pp. 26-27.) Of particular concern, a substantial number of leave hours recorded reflect FMLA leave beginning on August 16, 2021, which correlates with the date of an unrelated carpal tunnel release surgery. (Ex. 10, pp. 15-17.) Even after respondent raised issues pertaining to the scope of petitioner's request, she did not address this issue. (ECF No. 47, pp. 34-36.) In light of these concerns, merely providing a list of dates of approved leave falls short of preponderantly demonstrating that the absences would not have occurred but for her SIRVA. And, of course, petitioner bears the burden of proof with respect to the damages she claims. *Brewer*, 1996 WL 147722, at *22-23. Petitioner has not filed any evidence explaining how the list was generated, explaining how specific leave requests were selected for inclusion in her claim, or otherwise averring that it accurately reflects leave related to petitioner's SIRVA.[4] Accordingly, petitioner's loss of earnings claim is limited in scope to the absences respondent agrees are associated with her injury. Respondent indicates that he has determined that 74 hours of sick or vacation time (totaling $1,863.62) can be correlated to documented treatment of petitioner's SIRVA. (ECF No. 35, pp. 26-27.)

As petitioner notes, the Chief Special Master has previously concluded that a loss of earnings can encompass the use of paid time off necessitated by a vaccine injury, though only if the petitioner can establish that she would have later been paid for any unused leave. (ECF No. 47, p. 36 (discussing *Gross v. Sec'y of Health & Human Servs.*, No. 19-0835V, 2021 WL 2666685 (Fed. Cl. Spec. Mstr. Mar. 11, 2021), *mot. rev. denied* 154 Fed. Cl. 109 (2021)); *see also Eilan v. Sec'y of Health & Human Servs.*, No. 15-381V, 2024 WL 4222583, at *6 (Fed. Cl. Spec. Mstr. Aug. 15, 2024) (the undersigned citing approvingly to *Gross* for the broader proposition that loss of earnings can include future benefits). In this case, the evidence petitioner submitted does demonstrate that under her own employer's policy any accrued sick time that she maintained as of her retirement would be paid out without any overall cap at a minimum rate of one day per every six days of unused sick time.[5] (ECF No. 34, p. 8.) Given this,

---

[4] All of the time documented in petitioner's absence sheet is also included in her tally of the time constituting her loss of earnings claim. (*Compare* ECF No. 34, pp. 9-12 (absence sheet), *with* ECF No. 34, pp. 5-7 (petitioner's tally of her claim within her brief).) Accordingly, unless petitioner refrained from taking leave for any other reason during the nearly two-year period reflected on the absence sheet, the absence sheet purports to reflect a curated list of leave requests, raising the question of how petitioner created the list. Conversely, if the absence sheet does reflect all of the leave petitioner took during this period, then that highlights the need for petitioner to more explicitly confirm (with evidence beyond her counsel's briefing) that the leave reflected on the absence sheet is fairly attributable to her SIRVA. In either event, it remains unknown on what basis petitioner purported to recall and identify which leave requests were or were not related to her SIRVA.

[5] Under the leave policy at issue, any payout of accrued vacation time is capped (ECF No. 34, p. 8.) and petitioner has not provided evidence as to how vacation time is carried over from year to year or how she

10

and applying the reasoning in *Gross*, as urged by petitioner, she is entitled to an award for loss of earnings totaling $310.60.[6] Applying only the rate of payout *guaranteed* under the terms of petitioner's leave policy resolves respondent's concerns regarding speculation.

Respondent argues more broadly, however, that the Vaccine Act explicitly identifies those who may receive a loss of earnings award as those "whose earning capacity is or has been impaired" by reason of their vaccine injury, essentially questioning whether a use of paid time off constitutes a reduction in earning capacity in itself.  (ECF No. 35, p. 25 (quoting § 300aa-15(a)(3)(A)) (citing *Brown v. Sec'y of Health & Human Servs.*, No. 00-0182V, 2005 WL 2659073, at *6-8 (Fed. Cl. Spec. Mstr. Sept. 21, 2005) (noting that the loss of earnings must be calculated "in a cautious manner")).)  To respondent's point, the Federal Circuit has interpreted this phrasing as creating an eligibility requirement for an award of lost earnings, albeit in the context of parallel language pertaining to future loss of earnings for minors.  *Tembenis v. Sec'y of Health & Human Servs.*, 733 F.3d 1190, 1194 (Fed. Cir. 2013) (stating that under § 300aa-15(a)(3)(B) "[i]n order to be eligible for lost earnings, the minor must have an injury: (1) which is vaccine-related; (2) which impaired the minor's earning capacity . . .").  Although the Chief Special Master has on multiple occasions addressed whether given circumstances support paid time off as a loss of earnings, I have not located any instance among these cases in which the availability of a loss of earnings award was challenged as a threshold question.  *See Gross*, 2021 WL 2666685, at *6; *Brown v. Sec'y of Health & Human Servs.*, No. 20-1287V, 2024 WL 5410122, at *6. (Fed. Cl. Spec. Mstr. Dec. 18, 2024); *Cyr v. Sec'y of Health & Human Servs.*, No. 21-0012V, 2024 WL 991944, *7 (Fed. Cl. Spec. Mstr. Feb. 6, 2024); *Ruppert v. Sec'y of Health & Human Servs.*, No. 18-1621V, 2023 WL 9063679, at *12 (Fed. Cl. Spec. Mstr. Nov. 30, 2023); *Bidlack v. Sec'y of Health & Human Servs.*, No. 20-0093V, 2023 WL 2885332, at *8 (Fed. Cl. Spec. Mstr. Apr. 11, 2023).

When lacking direct guidance, this program typically follows the Restatement (Second) of Torts.  *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1351-52 (Fed. Cir. 1999) (adopting the Restatement (Second) of Torts with respect to tort

---

has used her vacation time over the longer term.  Accordingly, vacation time cannot reasonably be included in her loss of earnings claim based on this record.  Additionally, depending on the overall amount of sick time accrued at the time of retirement, some accrued sick days (the first 60 days) will be paid at the full rate and some unused sick days can be paid out at a 1/4 rate.  (*Id.*)  However, as respondent argues, determining exactly how many sick days petitioner would have at her anticipated retirement would be speculative and, in any event, the record of this case lacks any information regarding petitioner's overall accrual and use of sick time that could even potentially lead to such a conclusion.  The fact that much of petitioner's later leave is marked as FMLA could imply that she had used up her paid leave; however, that would be speculation on this record.  Accordingly, petitioner has not preponderantly demonstrated that the sick time at issue would be paid out at more than the minimum amount at which sick time is potentially paid out under the policy.

[6] Respondent did not explain how many of the hours he identified were sick time versus vacation time.  I will allow petitioner the benefit of that ambiguity.  Because her sick time could be paid out at 1/6 of the actual time, $1,863.62 divided by 6 is $310.60.

principles to be applied in the Vaccine Program); *Tembenis*, 733 F.3d at 1196 (applying the Restatement (Second) of Torts with respect to general principles as to the forms of compensation available under section 15(a) of the Vaccine Act).  The Restatement (Second) explains that "[a] person physically harmed by the tort of another is entitled to receive as damages the amount of earnings he has been prevented from acquiring up to the time of the trial."  Restatement (Second) of Torts § 924 cmt. c (Am. L. Inst. 1979). In that regard, it characterizes harm to one's earning capacity as "the difference between what he probably could have earned but for the harm and any lesser sum that he actually earned in any employment . . . ."  *Id.*

Here, when examining petitioner's earnings holistically, including both her hourly wages and her benefits, petitioner earned less overall than she could have but for her injury.  That is, had petitioner not been injured, she could have actually worked the income-producing hours she missed due to her treatment of her injury and also preserved her accrued benefits, which she has demonstrated to have monetary value for the reasons discussed above.  However, due to her injury, petitioner did not actually work those income-producing hours and instead expended her valuable leave benefit. Thus, she has suffered a loss of earning capacity (i.e., a reduction in what earning was possible but for the injury) that did result in a loss of earnings (i.e., the ultimate value of her accrued leave) despite her use of leave to cover her usual wage.

In light of the above, and given the evidence at hand, petitioner is entitled to an award for loss of earnings totaling $310.60.[7]

### c. Out-of-Pocket Expenses

Under to the Vaccine Act, a petitioner is entitled to compensation for "actual unreimbursable expenses" which have been incurred relative to the alleged injury for "medical or other remedial care determined to be reasonably necessary." § 300aa-15(a)(1).  Petitioner requests reimbursement of out-of-pocket medical expenses totaling $2,950.12.[8]  (ECF No. 47, p. 34.)  However, respondent contends that petitioner should

---

[7] In *Gross*, the award for paid time off was reduced to a net present value because it constituted an award of future loss of earnings based on the fact that it was compensating for a loss that would be realized upon future employment separation.  2021 WL 2666685, at *6.  Here, however, based on petitioner's age and representation that she is already eligible to receive these benefits, this award may be considered actual rather than projected loss of earnings.  Moreover, given the amount at issue and given petitioner's age, a reduction to net present value would be de minimis.

[8] Originally, petitioner requested $4,010.10 in unreimbursable expenses, which included $1,059.98 for "OOP surgery." (ECF No. 34, pp. 4-5.)  However, respondent challenged this (and other expenses) as being due to an unrelated right arm issue.  (ECF No. 35, p. 28, n.7.)  Petitioner never addressed respondent's contention, but did subsequently drop the cost of the "OOP surgery" from her list of unreimbursable expenses, resulting in a new total request of $2,950.12.  (ECF No. 47, pp. 33-34.) According to petitioner, "OOP surgery" refers to a September 22, 2021 charge on her credit card by "Geisinger Danville PA."  (ECF No. 34, p. 29.)  Although petitioner had an orthopedic outpatient surgery for her carpal tunnel syndrome (Ex. 10, pp. 15-16), she never had surgery to correct the SIRVA at issue. Accordingly, even if petitioner's omission of the "OOP surgery" was inadvertent, I would still find it is not compensable.

12

be awarded only $1,557.26 for out-of-pocket expenses. (ECF No. 35, p. 27; ECF No. 46, p. 2, n.1.) Respondent challenges the following expenses:

- Petitioner seeks reimbursement of $10.00 for an August 5, 2021 credit card charge by Geisinger Danville PA. (ECF No. 47, p. 33; ECF No. 34, p. 25.) Respondent asserts this corresponds to a post-operative encounter for petitioner's carpal tunnel surgery. (ECF No. 35, p. 28 n.7 (citing Ex. 12, p. 17).)

Petitioner did not file any evidence indicating the reason for this $10.00 charge from Geisinger Danville and did not provide any response to respondent's correlation of that charge to an encounter for an unrelated condition. Accordingly, petitioner has not preponderantly demonstrated that this represents a reimbursable expense related to her SIRVA.

- Petitioner seeks reimbursement of her $30.00 copay for her physical therapy appointments. (ECF No. 47, p. 33; ECF No. 34, pp. 32-33.) Respondent does not generally dispute reimbursement of these copays but asserts that there is no corresponding medical record for copays listed for March 30, 2021; September 8, 2021; September 14, 2021; September 16, 2021; and September 24, 2021. (ECF No. 35, p. 28 n.8.) Accordingly, respondent disputes $150.00 of the physical therapy copays.

Respondent is persuasive in challenging $120.00 of these $150.00 in copays. Respondent is not persuasive in disputing petitioner's entitlement to reimbursement of the March 30, 2021 copay. Petitioner has submitted is an invoice from Pivot Physical Therapy. (ECF No. 34, pp. 32-33.) Although respondent is unable to correlate the invoice charge to the relevant medical records, he has not disputed the authenticity of the invoice given that he has accepted that many of the charges are reimbursable. Thus, the fact that petitioner has been charged these amounts is not at issue and respondent has not suggested any reason to suspect petitioner was seen at Pivot Physical Therapy for any reason other than her SIRVA during that period. Regarding the September 2021 copays, however, respondent is persuasive in challenging the lack of medical record documentation. Petitioner has not filed Pivot Physical Therapy records beyond May of 2021 (Exs. 4, 6); however, her other medical records confirm that as of August 26, 2021, she was referred to post-operative occupational therapy following her carpal tunnel release surgery and that she specifically requested a referral to Pivot Physical Therapy for this therapy. (Ex. 11, pp. 4-5.) Accordingly, the record evidence suggests that the September 2021 Pivot Physical Therapy copays were unrelated to petitioner's SIRVA.

- Petitioner seeks reimbursement of $114.51 paid to Geisinger Clinic on November 25, 2020. (ECF No. 47, p. 33; ECF No. 34, p. 21.) As with the physical therapy copays, respondent argues there is no medical record for this date of service corresponding to this expense. (ECF No. 35, p. 28 n.8.)

13

Whereas petitioner provided an invoice for her physical therapy copays, she evidences the $114.51 paid to Geisinger Clinic only by a line on her credit card statement. (ECF No. 34, p. 21.) Neither the credit card statement nor petitioner's briefing explains the reason for the charge, even after it was questioned by respondent. (ECF Nos. 34, 47.) The fact that the billing record indicates that the Geisinger Clinic in question is in Selinsgrove, Pennsylvania, might suggest that the charge originates from her orthopedist. (*See* ECF No. 34, p. 21.) However, it is impossible to confirm that based on the existing record. Unlike petitioner's treatment with Pivot Physical Therapy, petitioner's overall care from Geisinger cannot be easily parsed with respect to the condition at issue. Accordingly, petitioner has not preponderantly demonstrated that this amount is reimbursable as an expense related to her SIRVA.

- Petitioner seeks reimbursement of $544.14, which she identifies as a charge for a cortisone injection of April 5, 2023, and $564.21, which she identifies as a charge for an MRI of August 26, 2021. (ECF No. 47, p. 33; ECF No. 34, pp. 20, 27.) Respondent contends, however, that the supporting documentation does not identify the reason for the charges. (ECF No. 35, p. 28 n.8.)

Regarding the $544.14 petitioner seeks for reimbursement of a cortisone injection, petitioner submitted an invoice from Geisinger dated April 5, 2023. (ECF No. 34, p. 34.) Although the invoice balance owed by petitioner after insurance is $544.14, the total charge had been $5,308.20 and the reason for the charge is not indicated. (*Id.*) This amount is not readily identifiable as a charge for a cortisone injection, petitioner has not filed medical records for 2023, and in discussing the course of her treatment throughout her briefing petitioner did not at any other point assert that she received a cortisone injection in 2023. (ECF Nos. 31, 47.) Nor did petitioner seek to further explain or substantiate the nature of this invoice after respondent challenged its sufficiency. Accordingly, petitioner has not preponderantly demonstrated that this amount is reimbursable as an expense related to her SIRVA.

Regarding the $564.21 petitioner seeks for reimbursement of an MRI, petitioner submitted a credit card statement with a line item for that amount by "Geisinger Danville PA" of August 26, 2021. (ECF No. 34, p. 27.) The credit card statement does not indicate the reason for the charge. (*Id.*) However, other records filed by petitioner confirm that on that date she paid separate charges of $174.12 and $351.91 for a left upper extremity MRI performed on March 29, 2021. (Ex. 9, pp. 7, 12.) This adds up to only $526.03. The difference of $38.18 is explained by a third charge of that date, which was related to petitioner's August 4, 2021 guided ultrasound injection for her shoulder. (Ex. 9, p. 9.) Accordingly, while petitioner's description did not fully capture the nature of the charges, I find that petitioner has preponderantly established that the full amount of $564.21 is reimbursable as expenses related to her SIRVA.

- Petitioner seeks reimbursement of $10.00 spent at CVS on October 13, 2020, which she represents as the cost of a prescription. (ECF No. 47, p.

14

34.)  Respondent questions this because the credit card documentation shows a broader charge of $40.00, with only petitioner's handwritten notation suggesting a portion of the amount was related to her shoulder. (ECF No. 35, p. 28 n.8.)

Although petitioner's documentation of this expense is not ideal, her October 13, 2020 encounter record with PA Bright confirms she did receive a prescription for a pain killer for her shoulder as of that date.  (Ex. 3, p. 1141.)  Accordingly, petitioner has preponderantly demonstrated that she incurred this $10.00 cost as an expense related to her SIRVA.

In light of all of the above, I find that petitioner is entitled to compensation for unreimbursable expenses in the amount of $2,161.47.

## IV.     Conclusion

In light of the above, **I award petitioner a lump sum payment of $77,472.07 representing $75,000.00 in compensation for actual pain and suffering, $310.60 in compensation for actual loss of earnings, and $2,161.47 in compensation for actual unreimbursable expenses, to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement to petitioner**.  This amount represents compensation for all damages available under § 300aa-15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[9]

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master

---

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.